UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

VICTORIA MARMONTELLO,

                    Plaintiff,

          -against-                                      6:13-cv-1016 (LEK)

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.
_____

## DECISION and ORDER

## I.     INTRODUCTION

       This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 13 ("Plaintiff's Brief"); 16 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is affirmed.

## II.    BACKGROUND

       On December 28, 2010, Plaintiff Victoria Marmontello ("Plaintiff") filed an application for

disability insurance and Supplemental Security Income ("SSI") benefits, alleging disability with an

onset date of September 15, 2008.  R. at 157-58.  The application was denied on March 16, 2011.

R. at 85.  On April 5, 2011, Plaintiff filed a request for a hearing with an administrative law judge

("ALJ").  R. at 94.  On April 17, 2012, Plaintiff appeared with counsel for an in-person hearing

before ALJ Robert S. Gale ("Gale"), who presided over the hearing in Syracuse, New York.  R. at

33.

**A. Plaintiff's Medical Records**

Plaintiff was born on October 10, 1970. Dkt. No. 8 ("Record") at 260.[1] Plaintiff struggled

with anxiety from childhood. R. at 313. She sought treatment for her mental health concerns as

early as December 13, 2006, when she consulted with Psychiatric Wellness Care, PLLC. R. at 313-

14. She mentioned having anxiety since childhood as well as persistent problems with depression,

and described her mood as more down than up. R. at 313. She also mentioned having panic attacks

prior to 1993 that involved flashing images and stated that she had not sought help because she

could not afford it. Id.

Plaintiff was admitted to St. Joseph's Hospital Health Center on May 24, 2009 after an

attempt to overdose on Klonopin and Effexor. R. at 772. Plaintiff stated that her husband had

cheated on her and that her relationship with her daughter was also strained. Id. She reported that

she had never attempted suicide before. R. at 775. Plaintiff had previously been diagnosed with

mood disorder, not otherwise specified, and PTSD following abuse by her stepfather when she was

a child. Id. She was prescribed Abilify, Lamictal, Klonopin, and Effexor but could not afford

Lamictal because her husband denied her the money needed. Id. Plaintiff listed her brother as

support and stated that her mother and her maternal grandmother were both diagnosed with

schizophrenia. R. at 776. Plaintiff was admitted on May 25, 2009 for further observation,

evaluation, and stabilization. R. at 780. Plaintiff was diagnosed with major depressive affective

disorder as well as asthma and gastroesophageal reflux disease. Id. On May 26, 2009, Plaintiff was

observed as significantly improved but feared returning to her family. R. at 782. She was unsure

---

[1] Citations to the Record are to the pagination assigned by the SSA. Dkt. No. 8 covers pages 1-383 under this pagination, and Dkt. No. 9 covers pages 384-951.

about exploring other options because she had been financially dependent on her husband and she would not be otherwise able to afford her medication.  Id.  At this time, her Global Assessment of Functioning ("GAF") score was noted as 39 on a 1-100 scale.  Id.  Plaintiff was discharged on May 27, 2009.  R. at 783.

On September 28, 2009, Plaintiff was voluntarily admitted to the St. Elizabeth Medical Center for psychiatric care after reporting suicidal ideations for the previous few weeks.  R. at 266-67.  Plaintiff was observed and interviewed by Dr. Timothy Page ("Dr. Page"), who constructed a medical and psychiatric history from Plaintiff's answers to his questions.  R. at 266.  Dr. Page noted that Plaintiff was having trouble sleeping and that she exhibited symptoms of depression in addition to her suicidal thoughts, but that she had not previously had any known psychiatric conditions.  Id.  Plaintiff reported a number of physical conditions, including asthma, osteoperosis, kidney stones, and hypotension, and claimed to smoke roughly two packs of cigarettes a week.  R. at 266, 269.  On September 29, the next day, Plaintiff was examined by Dr. Sudershan Dang ("Dr. Dang"), who noted multiple previous surgeries for kidney stones as well as ACL repair in Plaintiff's right knee and removal of Plaintiff's left ovary.  R. at 264.  Dr. Dang also indicated a chronic backache associated with disk hernation, occasionally radiating to the left leg but without any further symptoms.  Id.  Plaintiff underwent a psychiatric evaluation with Dr. Nalin Sinha ("Dr. Sinha") that same day.  R. at 262-63, 934.  Plaintiff reported various factors that contributed to her stress, including the loss of her job and her pending separation, and thinking of committing suicide using a knife.  R. at 262.  Plaintiff also reported that her antidepressants were leading to these suicidal thoughts and that she had not been taking them as a result; she had been on a combination of Klonopin, Effexor-XR, Lamictal, and Abilify.  R. at 262, 934-35.  She gave up custody of her two

3

children, aged fourteen and three at the time, because she felt that she could not take care of them. R. at 262, 934. Plaintiff mentioned a prior medication overdose where she was hospitalized for two weeks and her follow-up treatment at St. Joseph's. Id. She discussed issues of mental, verbal, and sexual abuse by her stepfather during her childhood, and stated that there was similar emotional abuse in her most recent relationship. R. at 263, 935. Dr. Sinha diagnosed Plaintiff with major depressive disorder, recurrent and severe without psychosis. R. at 263, 936. Dr. Sinha stated that her GAF score was "currently 20." Id. As a result, Dr. Sinha prescribed a lower dose of Klonopin and a higher dose of Abilify without the other two medications Plaintiff had been taking previously, planning to monitor Plaintiff's condition and adjust as necessary. Id.

Plaintiff was discharged from St. Elizabeth to live with her brother on October 5, 2009, after extensive therapy with family involvement. R. at 260-61, 931. Plaintiff was "displaying stable behavior with no psychosis, hallucination, or suicidal feelings," R. at 261, and her GAF score was listed at "60 or more," R. at 933. She was prescribed Celexa and Abilify on an ongoing basis. R. at 261, 932. Plaintiff was referred to Herkimer County Mental Health Services, and a psychosocial history was compiled on November 2, 2009. R. at 327-31. Dr. Richard Zoppa ("Dr. Zoppa") observed Plaintiff on November 5, 2009. R. at 324-26. Dr. Zoppa noted Plaintiff's increasing anxiety about her brother's insistence that she move out once her separation was finalized, but also stated that Plaintiff claimed to do much better with the medications she had been taking. R. at 325. He stated that she was prone to unexpected and sometimes prolonged panic attacks. R. at 326. Dr. Zoppa diagnosed Plaintiff with major affective disorder and generalized anxiety disorder with panic disorder. R. at 325. Plaintiff was discharged on December 24, 2009 due to her relocation to Syracuse. R. at 332-33, 752.

Plaintiff was admitted to St. Joseph's on April 8, 2010 for ongoing depression. R. at 353, 359. In a consultation with Dr. Matthew Rosa ("Dr. Rosa"), Plaintiff stated that she was in the midst of a divorce with her husband. R. at 357, 362. She admitted attempting to overdose on her prescribed Klonopin and Effexor. Id. After starting on a trial of Klonopin and Effexor, her symptoms significantly improved, and she was making progress on all fronts. R. at 353. She was discharged on April 15, 2010 after improving her GAF score from 35 to 65. Id.

On April 22, 2010, Plaintiff was admitted to Community General Hospital in Syracuse, where she was observed by Dr. Riaz Syed ("Dr. Syed"). R. at 281-82. Dr. Syed stated that Plaintiff had been admitted after having specific thoughts of overdosing on her medication. R. at 281, 342, 348. Plaintiff also indicated that "people tell her that they cannot tolerate her personality because she is too aggressive." R. at 282. Dr. Syed noted that Plaintiff mentioned wanting to go back to school. Id. Dr. Syed diagnosed Plaintiff with major depressive disorder; borderline personality traits; and osteoperosis, sciatica, arthritis, and kidney stones, by history. Id. Dr. Syed recommended that Plaintiff be placed back on her medications, with Plaintiff identifying Celexa as relatively effective. Id. On the same day, Plaintiff was also examined by Dr. Irene Werner ("Dr. Werner"). R. at 279-80. Dr. Werner noted that Plaintiff was responsive to her interview questions but had the same suicidal thoughts. R. at 279. As a result, Dr. Werner diagnosed Plaintiff with depression. R. at 280.

On April 23, 2010, Plaintiff was seen by the Department of Psychiatry due to concerns of suicidal ideation, noting that "she was planning to overdose on her medications." R. at 295, 297. Plaintiff's history was listed as including depression and physical and sexual abuse, and mentioned her 2009 hospitalization and ongoing outpatient treatment. R. at 295-96, 343-44. Also recognized

were Plaintiff's limited support systems and inability to see her children. R. at 297, 342. Plaintiff's medications were recommended to be reviewed and discharge was not recommended until Plaintiff was stable. Id. Plaintiff was discharged on April 27, 2010, after five days under the supervision of Dr. Pemala Pradhan ("Dr. Pradhan"). R. at 277-78. In addition to the stress factors mentioned above, Dr. Pradhan noted a report that Plaintiff was facing a civil suit for mismanaging a trust fund for her children. R. at 277. Her treatment while admitted consisted mostly of supportive therapy. Id. Plaintiff was prescribed Abilify, Klonopin, and Celexa as well as omeprazole at the time of her discharge. R. at 278. Dr. Pradhan's diagnoses were the same as Dr. Syed's, but with the addition of gastroesophageal reflux disease. Id.

On May 4, 2010, Plaintiff returned to Community General Hospital, complaining of right foot pain without any known underlying trauma, and was treated by Dr. Tom Meder ("Dr. Meder"). R. at 272. Plaintiff admitted to smoking roughly a third of a pack a day. Id. X-rays and ultrasounds came back negative. R. at 273-76. Dr. Meder diagnosed Plaintiff with plantar fasciitis and gave her a Reese shoe and crutches. R. at 273. Plaintiff was then discharged with instructions to return to orthopedics if she felt that the pain was such that she could not work. Id. On August 6, 2010, Plaintiff underwent an examination for heel pain with Dr. Robert DeCarlo ("Dr. DeCarlo"). R. at 390. Dr. DeCarlo determined that Plaintiff's symptoms were compatible with plantar fasciitis and recommended stretching exercises, orthotics, and weight reduction. R. at 391.

Plaintiff returned to Herkimer County Mental Health Services on July 12, 2010, where a new psychosocial history was compiled by a licensed clinical social worker. R. at 319-21. On August 4, 2010, after being observed by Dr. Zoppa, Plaintiff's diagnoses remained the same as they had in 2009. R. at 322-23.

Plaintiff attempted to reestablish her relationship with Herkimer County Mental Health Services in January 2012. R. at 696-98. She had previously been a client in 2009 and from 2010-11. R. at 697. However, given Plaintiff's testimony, it appears that she did not return before her hearing in April 2012. R. at 44.

Plaintiff visited Slocum-Dickson Medical Group on July 22, 2010 complaining of a lack of interest in daily activities and abdominal pain. R. at 412, 458. X-rays were taken, and while a bone spur was noted at the L3-L4 levels and some straightening was observed, no abnormalities were identified that would cause the pain Plaintiff complained of. Id. After further testing, Plaintiff was found to have multiple non-obstructing kidney stones on August 23, 2010, and increased water intake was recommended. R. at 410-11. For her mental health concerns, she was instructed to follow up with Dr. Zoppa. R. at 464.

Plaintiff visited St. Joseph's on September 17, 2010 after complaining of flank pain that she rated at seven out of ten. R. at 339. She underwent an ultrasound for kidney stones on September 17, 2010. R. at 334. The ultrasound showed a slightly large right kidney but no visible stones. Id.

On September 26, 2010, Plaintiff visited Slocum-Dickson to treat right flank pain. R. at 406. Upon a renal sonogram, minimal fullness of the left renal collecting system was detected but no other abnormalities surfaced. Id. A CT scan was ordered, and on October 1, 2010, Plaintiff returned to discuss the results, which showed bilateral kidney stones. R. at 388, 402, 404. Dr. Naeem Samad ("Dr. Samad"), the treating physician, noted that a urinalysis test was negative for nitrites and leukocytes but had trace quantities of blood. R. at 389. However, the stones appeared to be of a small size, measuring two millimeters or less. Id. Dr. Samad recommended increasing Plaintiff's fluid intake. Id. Plaintiff was treated in the emergency room in January 2011 for lower

7

back pain.  R. at 683.  After follow-up X-rays did not identify any spinal abnormalities, R. at 678-79, Plaintiff returned on March 9, 2011 with similar symptoms and was asked to increase fluid intake.  R. at 676-77.  After a March 16, 2011 scan, Plaintiff was found to have several small stones in both kidneys, after which further testing was ordered to determine if there was an underlying cause for her frequent kidney stones.  R. at 666, 671.  Plaintiff returned to Slocum-Dickson on October 26, 2011 with further reports of flank pain.  R. at 577.  Further testing was ordered regarding potential kidney stones and she was told to increase fluid intake.  Id.  Plaintiff returned to St. Elizabeth in March 2012 complaining of back pain.  R. at 820, 841-43.  A CT scan showed at least three stones of at least 3 millimeters in her right kidney and a number of small stones in her left kidney.  R. at 834, 849.  After discussion with Plaintiff, Dr. Robert Fleischer ("Dr. Fleischer") agreed to try to treat the stones surgically.  R. at 825, 827.  This surgery removed the largest stone after fragmentation and the two smaller stones intact.  R. at 828.  A later scan showed no evidence of any significant fragments remaining.  R. at 820.

Plaintiff was admitted to Faxton-St. Luke's Healthcare on December 22, 2010 after complaining of chest pain with radiation to the neck and arm.  R. at 364.  After undergoing a stress test on December 23, 2010, which came back negative, Plaintiff was approved for discharge by Dr. Goutham Malempati ("Dr. Malempati").  R. at 366, 379, 392, 395.  Plaintiff returned to Slocum-Dickson on July 8, 2011 regarding chest pain, palpitations, and anxiety attacks while sleeping.  R. at 644.  Plaintiff was referred to a sleep lab and recommended for an electroencephalogram.  R. at 647.  After several more months of more frequent chest pain with no specific ascertainable cause, R. at 597, 631, 649-59, 899, 902, 911, 922, Plaintiff underwent a cardiac catheterization on September 20, 2011, R. at 595.  Plaintiff's chest pain returned, however, on February 6 and 7, 2012, leading to

an emergency room visit. R. at 870. After chest X-rays returned negative, Plaintiff was prescribed Percocet and discharged. R. at 874, 877.

Plaintiff prepared a disability report with F. Peek on December 28, 2010. R. at 183, 194. Her claimed disabilities were anxiety, depression, chronic kidney stones, plantar fasciitis, spinal bone spurs, osteoarthritis, osteoperosis, asthma, and allergies. R. at 184. Plaintiff stated that she stopped working in 2005 to take care of her infant son. Id. Plaintiff listed her current medications as Abilify, albuterol, Celexa, Klonopin, Loratadine, Lunesta, Naproxen, and vitamin D. R. at 187.

On January 5, 2011, Plaintiff returned to Slocum-Dickson due to periods of dizziness and instances "where she passes out." R. at 439. Dr. Thomas John ("Dr. John") determined that Plaintiff was probably suffering from vertigo or syncope and referred Plaintiff to neurology. R. at 441.

Plaintiff completed a function report on January 13, 2011. R. at 196, 207. She stated that she was working full time as a receptionist before her disability. R. at 197. Plaintiff's sleep was affected by nightmares and insomnia, and she could not find the energy to bathe more than twice a week. Id. Plaintiff reported that it often took her friends coaxing her in order to care for herself. R. at 198-99. She volunteered for Meals on Wheels, which allowed her to get a free lunch. R. at 198, 205. She stated that housework was a struggle and that she no longer ironed clothes because of the effort and concentration required. R. at 198. Plaintiff did not have a car but she would walk and take the bus to doctor's appointments, to church, and to shop for groceries. R. at 199. She stated that she had difficulty with concentration, which kept her from watching TV and holding conversations. R. at 200, 202. Plaintiff reported no issues with sitting or using her hands, but standing, walking, climbing stairs, kneeling, squatting, reaching, and lifting caused pain, largely in

her knees.  R. at 201.  Plaintiff was able to walk two blocks at a time, but she would have to rest for ten to fifteen minutes before she could continue walking.  R. at 202.

Plaintiff indicated that she had had pain in her knees, hips, and spine for roughly fifteen years, and that it would radiate to her extremities and her neck.  R. at 203-04.  The pain affected her ability to do the dishes, which she only did once a week as a result.  R. at 205.  She was taking Naproxen to relieve the pain, which would alleviate the pain for several hours, and had been taking it since her early twenties.  R. at 204.  Plaintiff's anxiety began as a small child, and many triggers could bring on panic attacks.  R. at 206.  When feeling an anxiety attack, she would typically take a pill, but the attacks could persist for hours or days before she could function again.  R. at 207.  As a result, her ability to socialize was limited.  Id.  Plaintiff noted short term memory loss from her medications.  R. at 203.  She had a fear of authority figures and a difficult time dealing with stress. Id.

Dr. Muhammad Toor ("Dr. Toor") completed an internal medicine examination of Plaintiff on February 8, 2011.  R. at 473.  Dr. Toor summarized Plaintiff's history, including her osteoarthritis, which caused pain rated at a nine out of ten; osteoporosis of her left hip; asthma, diagnosed in 2000 and requiring roughly weekly use of an inhaler; kidney stones, of which she estimated she had roughly 40; and anxiety and depression, including suicidal ideations and exacerbated by insomnia.  R. at 473-74.  Plaintiff reported smoking roughly three or four cigarettes and three or four cigars daily, but had stopped drinking six years earlier.  R. at 475.  Dr. Toor observed Plaintiff with a normal gait, the ability to walk on heels and toes without difficulty, the ability to squat roughly one third of the way down, and the ability to rise from a chair without difficulty.  R. at 476.  Dr. Toor noted that Plaintiff used a cane or a crutch on occasion, but she did

not bring them to the evaluation and he believed that these devices were not medically necessary.
Id. Plaintiff showed nearly a full range of movement regarding her back and her extremities. R. at
477. Dr. Toor diagnosed Plaintiff with knee pain, back pain, arthritis of the knees and spine,
osteoporosis of the left hip, kidney stones, by history, "questionable" seizures, asthma, insomnia,
depression, and anxiety and labeled her long-term prognosis as "fair." Id. Dr. Toor found no
limitations in Plaintiff's ability to sit, stand, or to climb, push, pull, or carry heavy objects, but noted
environmental limitations due to Plaintiff's asthma. R. at 478.

On the same day, Dr. Rachelle Hansen ("Dr. Hansen") completed a psychiatric evaluation of
Plaintiff. R. at 479. Dr. Hansen listed Plaintiff's four hospitalizations in 2009 and 2010 for suicidal
thoughts. Id. Plaintiff reported receiving roughly eight hours of sleep per night but waking up
approximately three times per night. R. at 480. She typically experienced symptoms of anxiety and
depression even with medication. Id. Dr. Hansen noted that Plaintiff's mother suffered from
depression and anxiety. Id. Plaintiff indicated that she had difficulty dressing, bathing, and
grooming herself. R. at 482. While she made a point to make her bed every day, other household
tasks would go unfinished for a week. Id. Plaintiff would require help with laundry due to pain in
her back. Id. While she could manage her money, Plaintiff was having difficulty saving and
thought she could benefit from assistance. Id. Her anxiety typically precluded her from driving or
taking public transportation. Id. While she did not get along with her family, she did socialize with
friends. Id.

Dr. Hansen determined that Plaintiff could follow and understand simple directions and
instructions, perform simple tasks independently, maintain attention and concentration as well as a
regular schedule, learn new tasks, and relate adequately with others. Id. However, Dr. Hansen

stated that Plaintiff might have trouble with performing complex tasks independently, making appropriate decisions, and dealing appropriately with stress.  Id.  She diagnosed Plaintiff with major depressive disorder, severe and general anxiety disorder and indicated Plaintiff's prognosis was guarded "given [her] physical and psychiatric difficulties."  R. at 483.

On March 9, 2011, Dr. J. Davie ("Dr. Davie") completed a physical residual functional capacity ("RFC") assessment of Plaintiff.  R. at 79.  Dr. Davie found no exertional, postural, manipulative, communicative, or visual limitations.  R. at 80-81  However, he found that Plaintiff should avoid concentrated exposure to extreme cold and heat as well as fumes, odors, dusts, gases, and poor ventilation.  R. at 82.  Dr. Davie relied on Plaintiff's reported history of asthma and her reports of using an inhaler once per week and her regular smoking to make this determination.  R. at 82.

Dr. M. Totin ("Dr. Totin") completed a Mental RFC Assessment and Psychiatric Review Technique for Plaintiff on March 15 or 16, 2011.  R. at 485, 501.  Dr. Totin discussed Plaintiff's claimed physical and mental concerns but noted that her "physical limitations are not supported by objective findings."  R. at 497.  As for her mental health concerns, Dr. Totin recited Plaintiff's "significant history" of treatment, including one hospitalization for a reported suicide attempt.  Id. Dr. Totin stated that Plaintiff's symptoms were consistent with major depressive disorder and general anxiety disorder.  R. at 488, 490.  Dr. Totin determined that Plaintiff's restrictions on activities of daily living and her difficulties in maintaining social functioning were mild, but that she had moderate difficulties maintaining concentration, persistence, or pace.  R. at 495.  Dr. Totin also found one or two repeated episodes of deterioration, each of extended duration.  Id.  As a result, the C criteria had not been established.  R. at 496.  Dr. Totin indicated that Plaintiff's impairment was

severe, but determined that it did not meet or equal a listing level.  R. at 497.  Plaintiff was found to be moderately limited in her ability to understand, remember, and carry out detailed instructions, to make simple work-related decisions, to respond appropriately to changes in the work setting, to set realistic goals or make plans independently of others, and to complete a normal workday and workweek without interruptions.  R. at 499-500.  However, Plaintiff was not significantly limited in any other area.  Id.

On April 16, 2012, Dr. Sherin Varkey ("Dr. Varkey"), Plaintiff's supervising physician at Slocum-Dickson, filled out a Medical Source Statement with Nurse-Practitioner George Markwardt ("Mr. Markwardt"), who had been the primary consult for Plaintiff's visits to Slocum-Dickson.  R. at 691.  The statement estimated that Plaintiff could walk two city blocks without rest, sit for fifteen minutes continuously, and stand for thirty minutes continuously.  R. at 687.  Plaintiff would also need to take unscheduled breaks every fifteen minutes and shift positions at will.  Id.  Plaintiff was estimated to be able to lift and carry ten pounds frequently and twenty pounds occasionally, but never up to fifty pounds.  R. at 688.  Plaintiff would frequently be able to look up, hold her head in a static position, and turn her head to the right or left.  Id.  She would also occasionally be able to look down and rarely twist, bend, and climb stairs, but never crouch or climb ladders.  Id.  Plaintiff would have no limitations in grasping objects, fine motor skills, and reaching overhead with her arms.  Id.  The statement stated that Plaintiff should avoid moderate exposure to extreme cold and heat, humidity, and fumes, odors, and dusts, and to avoid concentrated exposure to wetness as a result of her asthma.  R. at 689.  Plaintiff was also expected to have good and bad days, resulting in involuntary absences from work roughly two days per month.  R. at 690.

**B. ALJ Hearing**

Plaintiff testified at a hearing before ALJ Gale on April 17, 2012. R. at 34. She stated that she drove to the hearing, and the only restriction on her license was an eyeglasses requirement. R. at 36. She stated that she lived in a house with her daughter along with her landlord and another tenant; she and her daughter had separate bedrooms. Id. Plaintiff's daughter had been diagnosed with bipolar disorder and dissociative identity disorder. R. at 36-37. Plaintiff used knee braces with Velcro on both her knees and crutches on occasion but did not need either constantly. R. at 37. The use of both the braces and crutches had been prescribed in 2002 by a doctor in Georgia. Id. Plaintiff used both simultaneously, typically for several days at a time, and roughly once or twice a year on average. R. at 37-38.

Plaintiff stated that she had the computer skills to complete administrative tasks. R. at 38. Plaintiff had completed one year of college courses and also had vocational certifications in keyboarding and cake decorating. R. at 38-39. Plaintiff had last been employed at the Beacon Center as a part-time secretary for seven weeks in 2011. R. at 39. She was responsible for lifting objects up to ten pounds. Id. Her employment ended because she developed severe anxiety attacks and was hospitalized for a heart catheterization. R. at 39-40. She had previously worked at a placement center and as a full-time secretary at a construction company, where she would have to carry objects up to 20 pounds. R. at 40. Plaintiff also worked as a full-time customer service representative for T-Mobile for under a year, where she did not have to lift or carry anything. R. at 40-41.

Plaintiff mentioned four significant medical conditions that she felt were barriers to working full-time on a regular basis: (1) her kidney stones, (2) severe arthritis in her knees, (3) arthritis in her

14

spine, and (4) osteoperosis in her left hip. R. at 41-42. She had been hospitalized twice for more than a couple days in the last four years due to her kidney stones. R. at 41. She had also had a total of six to eight surgeries for kidney stones; her most recent stones had passed. R. at 49. Plaintiff would be in severe pain from the stones at least once a month; she described the pain as a "sharp stabbing and then an achy throb" in her back and lower abdomen. Id. Plaintiff was taking Percocet for this pain, but often she would end up in the emergency room. Id.

Plaintiff also noted that the arthritis in her knees caused major pain and swelling and that her knees would sometimes "slip out of joint." R. at 41-42. She had been previously told that she was too young to have a knee replacement. R. at 42. She noted that her spine would tighten and sometimes pinch a nerve. Id. Her hip would also ache severely. Id. These last two conditions became significant in 2004. Id.

Plaintiff was also diagnosed with bipolar disorder by the Herkimer County Mental Health services. Id. Her symptoms would include severe anxiety, depression, and mood swings. Id. She had been hospitalized twice for mental health reasons, both for longer than ten days, since 2008. R. at 43. She was scheduled to resume regular mental health counseling in June 2012. Id. Previously, she had been in regular contact with Herkimer County Mental Health Services until August 2011, but her only visit since was in January 2012. R. at 43-44. Her appointments had originally stopped because of her job, and her attempts to resume contact were unsuccessful due to her medical issues. R. at 44. Plaintiff was taking Celexa, Abilify, and Atarax daily for her bipolar disorder. R. at 49. She suffered from memory loss as a result of the Celexa, which was not adjusted for that purpose. R. at 44. Plaintiff would also have trouble focusing and mentioned conversations as an example of when her mind would frequently wander. R. at 51. She mentioned having anxiety attacks stemming

15

from a wide range of triggers.  Id.  Typically, she would take an Atarax and do breathing exercises to calm herself down, which would take thirty minutes on average.  Id.  Plaintiff had attempted suicide through overdose twice, most recently in 2009, which resulted in Plaintiff's hospitalization. R. at 52.

On a typical day for Plaintiff, she would sit for fifteen to thirty minutes after letting her dog out.  R. at 45.  She would prepare something to eat, and typically she would spend the day trying to go on short-term walks.  Id.  Based on the advice of her mental health consults, she would call family and friends and also visit other friends two to three times per week.  Id.  She would typically be able to do one load of laundry in a day.  Id.  Plaintiff stated that while her daughter had recently left school due to her bipolar disorder, she helped around the house and that Plaintiff was working with her to manage her mental health concerns as her daughter was interested in finding employment.  Id.  Plaintiff stated that her shopping was done mostly online but that she could do "short light shopping" out of the house and that she typically drove two to three days a week.  R. at 45-46.  Plaintiff noted that she would only drive when necessary due to her anxiety, and that problems with her knees would often prohibit her from driving.  R. at 48.

Plaintiff stated that she had no problems with personal hygiene or tasks involving fine motor skills with her hands.  R. at 46.  She estimated that she could occasionally lift and carry up to about ten pounds and walk roughly a quarter mile before she would have to stop.  Id.  Plaintiff expressed that she could not bend due to her knees and her back and that climbing stairs often required assistance.  R. at 50.  Typically, she would be able to stand for no more than ten minutes and sit for fifteen minutes in an office chair, although in a recliner she would be able to sit for closer to thirty minutes.  R. at 46-47.  Any activity that Plaintiff did could only be sustained for five to ten minutes

before she would have to rest for at least fifteen minutes.  R. at 50.  Plaintiff would often feel tired during the day, which she believed was the result of her sleep apnea combined with her medication. Id.

### C.  Procedural History

ALJ Gale issued an unfavorable decision on April 27, 2012, finding that Plaintiff had not engaged in any substantial gainful activity since September 15, 2008, the alleged onset date of disability.  R. at 13.  While the ALJ found that Plaintiff had severe impairments, namely, depressive disorder and anxiety disorder, R. at 13-15, he also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I, R. at 16-18.  The ALJ considered Plaintiff's knee, hip, and back pain; sleep apnea; kidney stones; allergies; asthma; obesity; plantar fasciitis; osteoarthritis; osteoporosis; migraines; vertigo; and seizures; and found that these impairments were not severe since no evidence showed that any of these conditions either were continuous or significantly affected Plaintiff's ability to perform basic work activities.  R. at 14-15. The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but she would be limited to semi-skilled work due to her mental impairments.  R. at 18.  The ALJ stated that Plaintiff's impairments prevented her from performing any of her past relevant work.  R. at 18. However, given Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. Id.  Therefore, ALJ Gale concluded that Plaintiff was not disabled.  R. at 26.  Plaintiff filed a request for review on January 25, 2012.  R. at 8.  On June 7, 2013, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the SSA Commissioner

("Commissioner"). R. at 1-5. Plaintiff timely filed an appeal on June 24, 2013. Dkt. No. 1

("Complaint").

## III. LEGAL STANDARD

### A. Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the

correct legal standards and if her decision is supported by substantial evidence in the Record. 42

U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than

a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

The Court defers to the Commissioner's decision if it is supported by substantial evidence, "'even if

it might justifiably have reached a different result upon a *de novo* review.'" Sixberry v. Colvin, No.

12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of

Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not

uphold the ALJ's decision when it is supported by substantial evidence, but it is not clear that the

ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need

not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs.,

734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). The five-step analysis used by the SSA is sequential, meaning that the determination at each step dictates whether the analysis proceeds to the subsequent step. Gennardo v. Astrue, 333 F. App'x 609, 610 (2d Cir. 2009). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed with the analysis. Id.

At step one, the SSA considers whether the claimant's current work is "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If it is, the claimant is not disabled under the SSA standards. Id. At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If she does not have such an impairment, the claimant is not disabled under the SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I. Id. § 404.1520(a)(4)(iii). If it does not, the SSA continues to step four to review the claimant's RFC and past relevant work. Id. § 404.1520(a)(4)(iv). The claimant is not disabled under the SSA standards if the RFC reveals that the claimant can perform past relevant

19

work.  Id.  If the claimant cannot perform her past relevant work, the SSA decides at step five

whether adjustments can be made to allow the claimant to work somewhere in a different capacity.

Id. § 404.1520(a)(4)(v).  If appropriate work does not exist, then the SSA considers the claimant to

be disabled.  Id.

## IV.   DISCUSSION

Plaintiff argues that the Commissioner's final decision was not based on substantial

evidence because: (1) the ALJ erred in assessing Plaintiff's credibility as he failed to properly

evaluate Plaintiff's subjective symptoms and mischaracterized Plaintiff's treatment; (2) the ALJ's

Step Four determination is unsupported by substantial evidence because the ALJ failed to make

specific findings of fact regarding Plaintiff's past relevant work; and (3) the ALJ's Step Five

determination is unsupported by substantial evidence because the ALJ failed to consult a vocational

expert ("VE") in making his determination despite the presence of significant non-exertional

impairments.  Pl.'s Br. at 13-21.

### A.  Credibility Determination

ALJ Gale determined that Plaintiff's statements concerning the intensity, persistence, and

limiting effects of her symptoms were not entirely credible.  R. at 18.  He resolved Plaintiff's

conflicting claims regarding why she stopped working in 2005 in favor of the birth of her child as it

was the more common answer.  R. at 19; see also R. at 184 (birth of child), 320 (same), 368-69

(indicating son was born around this time).  But see R. at 343 (motor vehicle accident).  He found

Plaintiff's claim that her kidney stones caused severe work-related limitations non-credible due to

scans showing only limited issues with her kidneys.  R. at 19; see also R. at 404, 406, 408, 669.

ALJ Gale also indicated that there was no indication in the medical record that Plaintiff had ever

been diagnosed with knee or hip impairments or been prescribed crutches or knee braces, relying on reports in the record that Plaintiff had full range of motion in both knees and no instability, asymmetry, or weakness. R. at 19; <u>see also</u> R. at 462, 525, 536. The ALJ relied heavily on the consultative examination, where Plaintiff was able to walk on her heels and toes without difficulty, change for the exam, get on and off the exam table, rise from a chair without difficulty, and had full range of motion in all joints. R. at 19-20; <u>see also</u> R. at 476-77.

Plaintiff's claims regarding her inability to function for days after panic attacks were not found credible. R. at 20; <u>see also</u> R. at 206-07. The medical record only established two instances of significant deterioration, and Plaintiff responded well to medication in both instances. R. at 20; <u>see also</u> R. at 262, 353. ALJ Gale called attention to the fact that Plaintiff told her mental health providers that she was actively looking for work and enrolling in job training programs, R. at 282, 320, and that she volunteered for Meals on Wheels, R. at 198. Finally, ALJ Gale noted Plaintiff's inconsistent statements regarding her ability to drive. R. at 21; <u>see also</u> R. at 36, 199.

Plaintiff argues that (1) ALJ Gale relied on an improper legal standard in SSR 96-3p, 1996 WL 374181 (S.S.A. 1996) and 96-4p, 1996 WL 374187 (S.S.A. 1996), to determine credibility; (2) ALJ Gale improperly characterized Plaintiff's mental health history by using physical health-related visits as evidence of a lack of mental disability; (3) ALJ Gale ignored the ability of plaintiffs to engage in a trial work period under 20 C.F.R. § 404.1592(a); and (4) ALJ Gale misconstrued Plaintiff's testimony regarding driving. Pl.'s Br. at 13-17.

Plaintiff correctly points out that the legal standard in SSR 96-3p and 96-4p, cited by ALJ Gale, is not the correct standard under which to determine credibility. However, ALJ Gale cites SSR 96-3p and 96-4p not for the standard under which credibility is determined, but rather to note

that Plaintiff's complaints that are entirely unsupported by the remainder of the record cannot be given controlling weight. R. at 18. ALJ Gale indeed notes that SSR 96-7p, which states that credibility should be weighed by considering (1) the objective medical evidence, (2) the individual's statements regarding their symptoms, (3) statements provided by treating or examining sources, and (4) any other relevant evidence in the case record. SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. 1996). While SSR 96-7p goes on to state that subjective complaints "may not be disregarded solely because they are not substantiated by objective medical evidence," id., ALJ Gale merely declined to give Plaintiff's complaints controlling weight. R. at 18.

Given this legal standard, the Court finds that the only testimony specifically cited by ALJ Gale that was not directly contradicted was Plaintiff's subjective complaints regarding the effects of her panic attacks. Plaintiff's second argument, regarding the context in which her mental health history was considered by ALJ Gale, thus has significant merit. Out of an abundance of caution, the Court will disregard this portion of ALJ Gale's opinion in determining whether substantial evidence existed for his credibility finding. Given that "[w]here application of the correct legal standard could lead to only one conclusion," a remand is not needed, Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998), Plaintiff's argument will be denied if there is substantial evidence for ALJ Gale's finding of credibility under the standard outlined in SSR 96-7p after addressing both of Plaintiff's remaining two arguments.

Plaintiff also argues that ALJ Gale's consideration of Plaintiff's enrollment in job training programs and search for work should not be considered because a claimant can still be considered disabled even if they engage in a trial work period. Pl.'s Br. at 15-16; see also 20 C.F.R. § 404.1592(a). However, 20 C.F.R. § 404.1592 is not relevant to a consideration of credibility, but

rather related to an ultimate finding of disability.  SSR 96-7p specifically allows for the

consideration of "any other relevant evidence in the case record."  SSR 96-7p, 1996 WL 374186, at

*1.  As a result, ALJ Gale did not err in considering Plaintiff's enrollment in job training as relevant

to her credibility.

Plaintiff's fourth argument, regarding the resolution of the inconsistency of Plaintiff's

statements about driving, does have significant merit. ALJ Gale did not address Plaintiff's testimony

that she would only drive if she had to and that "[m]y anxiety usually prohibits me from driving on a

regular basis."  R. at 48.  However, given the remaining four arguments against Plaintiff's

credibility, ALJ Gale's decision to find Plaintiff's statements not credible was supported by

substantial evidence.  Plaintiff's conflicting statements regarding her cessation of work in 2005, the

contradiction of her claims regarding her kidney stones and her joint ailments, and her active

attempts to find work are by themselves sufficient to find that ALJ Gale's credibility determination

was supported by substantial evidence.

## B.  Step Four and Findings of Fact

An ALJ must specifically find the following to support a determination that a claimant can

perform a past relevant job: "1. A finding of fact as to the individual's RFC.  2. A finding of fact as

to the physical and mental demands of the past job/occupation.  3. A finding of fact that the

individual's RFC would permit a return to his or her past job or occupation."  SSR 82-62, 1982 WL

31386, at *3 (S.S.A. 1982); see also Kochanek v. Astrue, No. 08-cv-310, 2010 WL 1705290, at *11

(N.D.N.Y. Apr. 13, 2010) (quoting Kerulo v. Apfel, No. 98 Civ. 7315, 1999 WL 813350, at *8

(S.D.N.Y. Oct. 7, 1999)).  Plaintiff claims that ALJ Gale failed to make these specific findings,

particularly the actual physical and mental demands of her past work.  Pl.'s Br. at 17-18.  After ALJ

Gale analyzed Plaintiff's RFC in detail, R. at 18-24, he identified Plaintiff's work as a customer service representative and receptionist as her past relevant work, R. at 24. He noted that Plaintiff "is able to perform it as actually and generally performed." R. at 25. The ALJ specifically determined that Plaintiff would be able to maintain attention and concentration for tasks, maintain a regular schedule, relate adequately with others, and perform simple and complex tasks, she had met the requirements for returning to either of her past relevant jobs. Id.

Plaintiff correctly notes that this covers only the first and third categories above but not the second. Pl.'s Br. at 18. Given the guidance from SSR 82-62 to "secure evidence that resolves the issue as clearly and explicitly as circumstances permit," Plaintiff claims that ALJ Gale's failure to elicit testimony from Plaintiff regarding the mental demands of her past relevant work clearly and explicitly was in error. While Plaintiff is correct that ALJ Gale did not make specific findings of fact with regard to the second category mentioned above, the Court finds this error harmless. See Arguinzoni v. Astrue, No. 08-CV-6356T, 2009 WL 1765252, at *8-9 (W.D.N.Y. June 22, 2009) (finding a failure to record specific findings pursuant to regulations harmless because "it is not unclear whether the ALJ would have arrived at the same conclusion . . . if he adhered to the regulations"). As explained in the next section, even if a remand produced a finding that Plaintiff is unable to perform her past relevant work, the ALJ's proper treatment of Step Five precludes a remand because the same conclusion would result from a proper analysis under the regulations.

### C. Step Five Determination

Plaintiff argues that ALJ Gale failed to meet his burden of proof because he failed to consult a VE even though he was required to do so. Pl.'s Br. at 19-21. Plaintiff relies on Bapp v. Bowen, 802 F.2d 601 (2d Cir. 1986), and SSR 83-12, 1983 WL 31253 (S.S.A. 1996), in making this

argument. Plaintiff correctly notes that <u>Bapp</u> requires the testimony of a vocational expert if a claimant's non-exertional impairments significantly limit the range of work permitted by their exertional limitations. 802 F.2d at 605-06. However, <u>Bapp</u> requires the ALJ to make the determination of whether the limitations from non-exertional impairments are significant. <u>Id.</u> at 606. Here, ALJ Gale made such a determination, stating that Plaintiff "retains the ability to meet the basic mental demands of unskilled work" and that "her limitations have little or no effect on the occupational base of unskilled work at all exertional levels." R. at 25-26. While Plaintiff correctly refers to 20 C.F.R. §§ 404.1569a and 416.969a in determining non-exertional limitations, such as difficulty remembering detailed instructions, ALJ Gale's conclusion was that this limitation, taken with Plaintiff's other non-exertional limitations, was sufficient for the testimony of a VE to be unnecessary.

Moreover, under SSR 83-12, the ALJ is not obliged to elicit testimony from a vocational expert when a claimant's RFC falls within the categories of the grids. <u>Gravel v. Barnhart</u>, 360 F. Supp. 2d 442, 448 (N.D.N.Y. 2005). Section 204.00 of Subpart P, Appendix 2 provides guidance for assessing the jobs available to claimants who have the RFC to perform work at all exertional levels, particularly when a claimant's only limitations are environmental. While ALJ Gale did not specifically rely on Dr. Davie's RFC assessment, it is consitent with his reliance on Section 204.00 and constitutes substantial evidence supporting ALJ Gale's conclusion that Plaintiff's non-exertional limitations were not significant. Since Section 204.00 provides a framework for ALJ Gale's decision, the Court finds that ALJ Gale did not err in not consulting a vocational expert for testimony regarding jobs that Plaintiff could perform in the national economy. Therefore, the ALJ's failure to elicit testimony from a vocational expert does not constitute grounds for remand.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all

parties in accordance with the local rules.

**IT IS SO ORDERED**.


DATED:        March 31, 2016
              Albany, New York


Lawrence E. Kahn
U.S. District Judge